AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original     ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
10/16/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ASI    DEPTUY

# UNITED STATES DISTRICT COURT
for the Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
Oct. 16, 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ch    DEPUTY

United States of America

v.

JULIO BARAJAS-OROZCO,
OSCAR NAVARRO, and
CHRISTIAN PACHECO
    aka "German Carmona,"
            Defendants.

Case No.   2:24-mj-06330-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 16, 2024, in the county of Santa Barbara in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of More than 50 grams of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*
☒ Continued on the attached sheet.

/s/ Christopher Stantzos
*Complainant's signature*

Christopher Stantzos -- Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  Oct. 16, 2024

[signature]
*Judge's signature*

City and state:  Los Angeles, California

Hon. Brianna Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lisa Lindhorst (x6772)

**AFFIDAVIT**

I, Christopher Stantzos, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrants against JULIO OROZCO-BARAJAS ("BARAJAS"), OSCAR NAVARRO ("NAVARRO"), and CHRISTIAN PACHECO ("PACHECO") (collectively, the "TARGETS") for Distribution of Controlled Substances, in violation of 21 U.S.C. § 841(a)(1).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.  BACKGROUND OF AFFIANT

3. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since March 2020.  I attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting

firearms, explosives, arson, firearms trafficking, and gang investigations. Before joining the ATF, I was an Intelligence Analyst for the Federal Bureau of Investigation ("FBI") for approximately four and a half years. As an Intelligence Analyst, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations. Before joining the FBI, I was a forensic scientist for the Washington, DC Department of Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

4. As an ATF agent, I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and drug trafficking. Additionally, I have participated in many aspects of gang, firearms, and drug trafficking investigations, including undercover operations, arrests, physical and digital device search warrants, physical and electronic surveillance, GPS tracker installations, and the analysis of telephone call detail records. I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of firearm-trafficking and drug-trafficking, and money-laundering methods used to conceal the nature of the proceeds. I have conducted and participated in multiple investigations involving the illegal manufacture and sale of firearms and the sale of drugs. I have assisted in the execution of multiple search warrants for investigations related

to the illegal manufacture and sale of firearms and the sale of drugs. I am familiar with the methods employed by individuals involved in firearms and drug trafficking to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

### III. SUMMARY OF PROBABLE CAUSE

5. The charges in this complaint stem from three controlled buys in July 2024 and the fruits of a residential search warrant that was executed in August 2024. Specifically, this case began with information from a Confidential Informant ("CI")[1] who learned through social circles that PACHECO was a drug and arms dealer in Santa Barbara. At the instruction of ATF agents, the CI did a controlled fentanyl purchase with PACHECO on July 8, 2024. PACHECO arranged the deal and BARAJAS supplied the drugs. PACHECO then gave BARAJAS's number to the CI for future direct deals. When the CI struggled to get a response from BARAJAS a few days later, PACHECO prompted BARAJAS

---

[1] The Informant has worked with ATF for just over two years and is currently pending sentencing in a gun and drug trafficking case in which he has signed a cooperation agreement. According to the ATF, this CI has been active in over 9 ATF cases and has consistently provided credible and reliable information that has led to drugs and weapons seizures and at least nine arrests. ATF paid the CI $1,400 in this investigation and $4,100 for his work across all investigations over the last six months.

to respond. Then, on July 16, 2024, the CI met BARAJAS and bought one pound of methamphetamine, immediately followed by another two pounds of methamphetamine, all supplied by NAVARRO, who agents watched retrieve the methamphetamine from his home. NAVARRO is a two-time convicted felon. Law enforcement later searched NAVARRO's home and under his bed found 9.4 kilograms of methamphetamine, and just a few feet away in a makeshift closet law enforcement found a firearm and 147 rounds of ammunition.

## IV.   STATEMENT OF PROBABLE CAUSE

Based on my involvement in this investigation, including my own surveillance, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following.

### A. PACHECO and BARAJAS sell Fentanyl to the CI on July 8, 2024

6. In early July 2024, I directed the CI to Facebook message PACHECO to request an ounce of fentanyl. The CI did as instructed, using the code word "confetti." PACHECO responded via text message on July 1, 2024, that his "homie" has some and that the price would be $1,000.

7. On July 8, 2024, PACHECO sent the CI his phone number via Facebook messenger and told the CI to meet him at the Red Roof Inn in Lompoc, California, for the buy. Immediately before the buy, I along with other agents met with the CI, searched the CI (and found no contraband), outfitted the CI with a recording

device, and give the CI government funds. I then followed the CI to the meeting spot and watched as the CI met PACHECO. When they met, PACHECO told the CI that none of his three sources at the Inn had any fentanyl, but that PACHECO had other sources, so the CI drove PACHECO around as PACHECO called people asking for fentanyl. PACHECO soon directed the CI to BARAJAS's home (1309 W Guava Avenue in Lompoc).

8. PACHECO entered BARAJAS's home briefly, then returned and told the CI his associate would take them somewhere to get the fentanyl shortly. Soon after that, BARAJAS exited the house and told the CI and PACHECO to follow him to a parking lot in Lompoc, California. BARAJAS drove away and the CI followed in the CI's own car, and law enforcement followed in an unmarked car. BARAJAS stopped at the parking lot at the corner of North F Street and E College Avenue, and he directed the CI and PACHECO wait there while BARAJAS drove away for a few minutes then returned with the drugs. He entered the CI's vehicle, introduced himself as "Julio" (his first name) and handed the CI a baggie of suspected fentanyl while quoting a price of $750. The CI and BARAJAS then discussed in coded language prices for larger purchases in the future, including a pound of methamphetamine for $1,400. The CI then paid BARAJAS $700 in government funds for the fentanyl (mistakenly paying $50 less than the agreed-upon price), and BARAJAS left. The CI later gave $100 to PACHECO for arranging the deal. Before parting ways, PACHECO gave BARAJAS's number to the CI so that the CI could purchase directly from BARAJAS next time.

9. After the buy, the CI immediately met up with me and other agents and we seized from the CI the suspected fentanyl, which was later tested by a laboratory and confirmed to be 24.6 grams of substance containing fentanyl. I also showed the CI an unmarked DMV photograph of BARAJAS and the CI confirmed that was the man who provided him with the fentanyl.

B. **BARAJAS and NAVARRO Sell the CI One Pound of Meth on July 16, 2024**

10. Four days later, I directed the CI to request a pound of methamphetamine from BARAJAS. The CI texted BARAJAS on July 12, 2024, but after getting no response, the CI called PACHECO for help reaching BARAJAS. PACHECO agreed to contact BARAJAS and get BARAJAS to respond to the CI. Later that same day, BARAJAS contacted the CI and they arranged a drug deal via a recorded phone call. They planned for the deal to happen on July 16, 2024, and the CI would buy one pound of methamphetamine for $1,400.

11. An Undercover agent ("UC") accompanied the CI to this second deal. Before the buy, other agents and I met the CI, searched the CI (and found no contraband), outfitted the CI with a recording device, gave the CI government funds, and then set up surveillance at BARAJAS home. The CI then called BARAJAS to confirm that the CI was on the way. During this recorded conversation, the CI and BARAJAS agreed to meet in the parking lot of a business in Lompoc, California. The CI drove there with the UC and then texted BARAJAS that they had arrived.

12. BARAJAS arrived in his Chevy pickup truck (license plate ending in 5P3) shortly after 2:00 p.m. An unidentified female was in the front passenger seat. BARAJAS parked, exited, and walked through the parking lot to a silver Nissan Altima that was already parked there (Nevada plate ending in P17), which I subsequently learned is the car NAVARRO drives. BARAJAS entered that Nissan briefly then walked over and entered the front passenger seat of the CI's car. BARAJAS told the CI to drive a short distance away to park.

13. BARAJAS then handed the CI and UC a small baggie, but it mistakenly contained what appeared to the UC to be two ounces of fentanyl instead of the pound of methamphetamine that had been previously discussed. BARAJAS then made a phone call in front of the UC and the CI and requested from the person on the other line, in coded language, a pound of methamphetamine. BARAJAS then asked the CI to head back to the parking lot. At the same time, agents surveilling the Nissan saw the Nissan exit the parking lot. Agents followed the Nissan and saw it drive towards the area of what was later discovered to be NAVARRO's home (from which we later seized 9.4 kgs of methamphetamine wrapped and vacuum sealed the same way as the methamphetamine the CI was about to receive). Agents surveilling the car described the driver as a middle-aged Hispanic male with facial hair, which is consistent with NAVARRO.

14. Minutes later, the Nissan returned to the same parking lot and parked next to BARAJAS's truck. The driver of the Nissan, later identified as NAVARRO, placed a brown bag inside

the passenger door of BARAJAS's truck before returning to the Nissan. Moments later, BARAJAS walked over and retrieved the brown bag from the truck and brought it over to the CI's car. This time, the bag contained a vacuum-sealed plastic bag of approximately one pound of suspected methamphetamine, later confirmed by a laboratory to be 99% pure and 443.4 grams of actual methamphetamine.

### C. BARAJAS and NAVARRO Sell the CI Two More Pounds of Meth on July 16, 2024

15. After receiving that pound of methamphetamine, the CI asked BARAJAS for the prices of various amounts of methamphetamine. BARAJAS quoted one pound at $1,400, two pound at a discount of $1,200 per pound, and three pounds at a discount of $1,100 per pound. BARAJAS said he could get additional pounds of methamphetamine within 5-10 minutes. The UC agreed and paid BARAJAS $1,100 in documented government funds for the first pound. BARAJAS then made a phone call, again in front of the CI and UC, and requested in coded language another two pounds of methamphetamine. At the same time, the Nissan again exited the parking lot and drove towards NAVARRO's home. This time, agents continued to watch and they saw the man later identified as NAVARRO exit the Nissan and walk into his home with an empty blue grocery bag and exit moments later with the same bag full of bulky items.

16. NAVARRO then drove back to the parking lot. BARAJAS received a call then immediately walked to NAVARRO's car and returned moments later carrying a black plastic bag, which he handed to the UC. The bag contained two vacuum-sealed plastic bags of suspected methamphetamine. The UC paid BARAJAS $2,200 in government funds (which brought the total to $3,300) as the CI drove them back to the parking lot. Everyone left the scene shortly before 3:00 p.m.

17. Subsequent laboratory testing of the additional two pounds confirmed that it too is 99% pure and 895.2 grams of actual methamphetamine.

D. <u>Identifying BARAJAS and NAVARRO</u>

18. As mentioned above, the CI identified BARAJAS from an unmarked DMV photo (on the right below) after the July 8, 2024, buy. During the July 16 buys, law enforcement obtained clear footage (on the left below) of BARAJAS.



19.  At approximately 2:45 p.m. on July 23, 2024, Lompoc Police Department officers stopped the Nissan Altima for a traffic violation and identified NAVARRO as the driver (DMV photo on the right below) and his girlfriend Paola Hernandez as the passenger.  Lompoc PD Detective Magana also recognized NAVARRO from his prior work a gang detective.  ATF agents then conducted surveillance on NAVARRO at his home and photographed him, as shown on the left below.  ATF agents confirmed that the man pictured below was the same person they saw give the methamphetamine to BARAJAS on July 16, 2024.

10



### E. While Executing a Search Warrant on NAVARRO's Home, Law Enforcement Finds 9.4 Kilograms of Meth, a Drug Notebook, a Scale, and Evidence of Drug Sales from his Phone

20. After identifying NAVARRO as the supplier for these controlled buys, I along with several other members of law enforcement executed a federal search warrant on NAVARRO's home at 624 North D Street, in Lompoc, on August 26, 2024. Although several people lived there, NAVARRO lived in a trailer/motorhome in the backyard with his girlfriend. When we arrived to execute the search, NAVARRO was inside the trailer.

21. Law enforcement searched the trailer and found under NAVARRO's bed a red suitcase and a black duffel that collectively held 9.4 kgs of methamphetamine contained within nine vacuum-sealed bags.




22. A laboratory later tested a 2.3 kg sample (two of the nine units) and confirmed that the substance was 97% pure and 2,141.1 grams of actual methamphetamine (i.e. 1,070.55 grams of actual meth per unit). Although the entire 9.4 kg exhibit was not weighed and tested, I believe based on my training and experience and discussions with other law enforcement that the purity and weight based on the two samples that were tested can be extrapolated, which would mean that the nine units collectively contained approximately 9.4 kilograms of actual methamphetamine.

27. During the search of NAVARRO's trailer, law enforcement also recovered a scale with white residue on it and a notebook with a list of what appeared to be NAVARRO's running tally of bulk drug purchases. Most recently, it stated "9 bottellas 8-18-24" (dated eight days before the search).

"Bottellas" or bottles is slang for methamphetamine, and nine is the number of vacuum sealed bags of meth he had under his bed. The notebook displayed similar entries for multiple dates going back months, including in July when the CI bought three pounds of methamphetamine.

28. Law enforcement also recovered NAVARRO's iPhone. In addition to the warrant permitting a search of his phones, NAVARRO consented to a search. The phone contained multiple conversations over the past year in which he sold both drugs (in coded language) and guns (including texting images to buyers of him holding firearms). The phone also confirmed that NAVARRO and BARAJAS had a history of drug dealings in the past and that NAVARRO was the individual BARAJAS called throughout the July 16, 2024, controlled buys discussed above. I observed when watching the video recording of those controlled buys that BARAJAS used a white cellphone to make those calls to his supplier, and law enforcement recovered a white cellphone from BARAJAS when executing our search warrants. The number associated with BARAJAS's white phone is saved in NAVARRO's phone as "Chaparron." The screen shots below show that NAVARRO and BARAJAS were in contact shortly before, several times during, and several times after the controlled buys from 2:00 – 3:00 p.m. on July 16, 2024.

13



**F. NAVARRO Has a Firearm and Hundreds of Bullets within Feet of his Methamphetamine**

29.  Mere feet from the headrest of that same bed inside NAVARRO's trailer, law enforcement found a firearm in a box next to a slew of ammunition — all contained within a makeshift closet.  I later examined the firearm and all of the ammunition in person and confirmed that the firearm is a Ruger New Vaquero .45 caliber revolver bearing serial number 512-78743, manufactured in New Hampshire.  I also determined that the ammunition consists of 100 rounds of Winchester-Western .380 caliber ammunition, 37 rounds of Winchester Auto .380 caliber ammunition, and ten rounds of Hornady .380 caliber ammunition, all of which was manufactured outside California (specifically, in Mississippi, Nebraska, or Illinois).[2]

---

[2] NAVARRO also had a second revolver in the closet, right next to the ammunition, but it appeared to law enforcement to be an antique, so we did not seize it.  Later when reviewing his

14



### G. NAVARRO Admitted to Possessing the Gun and the Drugs

30. After the search, law enforcement spoke to NAVARRO in front of the home. He was informed of his *Miranda* rights, waived his rights, and then told the interviewing officers that he and his girlfriend were the only ones with access to the trailer and that the firearm inside the Trailor was his. He admitted to being a felon and to knowing that he was not supposed to have firearms. He claimed his girlfriend knew nothing about anything in the trailer. He also claimed that he "found" the bag of drugs 1.5 weeks prior "attached to a telephone pole" in an alley just south of his house and that he was going to sell the narcotics to a friend for a couple hundred dollars. When officers doubted his story, NAVARRO said he would take a polygraph. When confronted with his drug notebook,

---

phone, I saw text messages of NAVARRO attempting to sell this revolver.

NAVARRO admitted it was his but denied it had anything to do with drugs. NAVARRO also said he formerly used drugs but doesn't anymore.

31. Officers next interviewed the girlfriend. She claimed to know nothing about anything inside the trailer and was shocked to learn there were drugs under the bed. She said she has never seen NAVARRO use or sell drugs.

### H. NAVARRO Is a Two-Time Convicted Felon

32. Based on my review of certified conviction records, I know that NAVARRO has been convicted of the following two felonies in the Superior Court for the State of California in the County of Santa Barbara:

    a. On or about July 18, 2013, he was convicted in Santa Barbara County Case No. 1463607 of felony Child Abuse in violation of California Penal Code Section 273A(a), for which he received a 150-day sentence.

    b. On or about February 27, 1997, he was convicted in Santa Barbara County Case No. SM101708 of Burglary of a Motorhome, in violation of California Penal Code Section 459, for which he received a three-year sentence.

### VII. CONCLUSION

33. For all of the reasons described above, I submit that there is probable cause to believe that the TARGETS each

16

committed a violation of 21 U.S.C. § 841(a)(1) as described above.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 16th day of October, 2024.

_____
HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE